DEATON GROCERY COMPANY V. INTERNATIONAL HARVESTER COMPANY OF AMERICA.

Decided October 23, 1907.

**1.—Corporation—Ultra Vires.**

A corporation created for the purpose of purchasing and selling goods has no authority to bind itself by guaranty of the note of another given in a transaction in which it has no interest.

**2.—Same—Case Stated.**

A mercantile corporation guaranteed payment of the notes of a merchant largely indebted to it and in failing circumstances, deriving no benefit therefrom except that, by enabling him to continue business longer it was enabled to collect a larger amount of his debt to it than it could have done if his failure had been hastened by suit on the notes. Held that the transaction was *ultra vires*, disclosed no elements of estoppel, and there could be no recovery upon the guaranty.

Appeal from the District Court of Dallas County. Tried below before the Hon. Thomas F. Nash.

*I. N. & J. H. Dennis, John C. Robertson* and *George A. Robertson,* for appellant.—A corporation, other than a surety and guaranty company, has no power to make an accommodation endorsement; and there being no question of innocent purchaser or bona fide holder for value at issue, such attempted endorsement is ultra vires and void, and not binding upon the corporation, even though it may derive some benefit from it; and being unable to make the endorsement itself, the corporation can not delegate the authority to make it to its officers and agents, and when done by them, a ratification by the directors and stockholders will not bind the corporation, but if there is any liability it is the personal liability of the officer making the endorsement. Revised Statutes of Texas, art. 665; Clark & Marshall on Corporations, secs. 125 and 184; Wheeler v. Everett Land Company, 14 Wash., 630; Madison Plank Road Co. v. Watertown Co., 7 Wis., 59; Twiss v. Guaranty Life Ass., 43 Am. St. Rep., 418; Knickerbocker v. Wilcox, 21 Am. St. Rep., 595; Norton v. Derby National Bank, 60 Am. Rep., 335; Bank of Genesee v. Patchin Bank, 19 N. Y., 312; Morford v. Farmers Bank, 26 Barb., 568; Bridgeport Bank v. Stone Dressing, 30 Barb., 421; South Texas Nat. Bank v. La Grange Oil Co., 40 S. W., 328; Humboldt Mining Co. v. American Mfg. & Min. Co. et al., 62 Fed., 357; Northside Ry. v. Worthington, 88 Texas, 562; Low v. Central Pac. Ry. Co., 52 Cal., 53; Mississippi & M. Ry. Co. v. Howard, 7 Wallace (U. S.), 392; Lucas v. White Line Transfer Co., 59 Am. Rep., 454; Penn Ry. v. Alton Ry., 118 U. S., 290; Elevator v. Memphis, etc., Ry., 4 Am. St. Rep., 798; National Park Bank v. Remsen, 43 Federal, 226; West St. Louis Savings Bank v. Shawnee Bank, 95 U. S., 557; Holmes, etc., v. Willard, 11 L. R. A., 170; Berry v. Yates, 24 Barb., 199; Marine Bank v. Clements, 31 N. Y., 33; Gould v. Norfolk Lead Company, 9 Cush., 338.

*Cockrell & Grey,* for appellee.—There was good and sufficient consideration for the endorsements and they were not accommodation endorsements. Armstrong Co. v. Snyder, 39 S. W. Rep., 379; College Park v. Ide, 15 Texas Civ. App., 273; Wilkins v. Carter, 84 Texas, 438; Daniel, Negotiable Instruments (4th ed.), sec. 185 and cases cited; 1 Page on Contracts, sec. 274, and cases cited; 9 Cyc., p. 311 and numerous cases cited.

Deaton, as the active vice-president and general manager of appellant, had both the actual and apparent authority to make the

endorsements to protect his company's interests. Panhandle National Bank v. Emery, 78 Texas, 499; Dallas Ice Company v. Crawford, 44 S. W. Rep., 875.

The incidental powers of a corporation authorize it to do many things in its own interest which are not specially authorized by its charter. Further than this, it is not every ultra vires act of a corporation that is void. Fort Worth City Co. v. Bridge Co., 151 U. S. 294; Book 38 Lawyers' Ed., 168; Steger v. Davis, 27 S. W. Rep., 1068.

If the act of appellant in endorsing the notes sued on was ultra vires, which we deny, it is estopped from setting up this defense, because the contract between appellee and appellant. has been performed by appellee, and appellant has received the benefits from same, and can not now place appellee in statu quo; and to not allow appellee to now recover would be a fraud, and accomplish a legal wrong. 7 Thompson's Commentaries Law of Corporations, secs. 8321-2; same work, vol. 4, sec. 5258; 1 Clark & Marshall, Private Corporations, pp. 569-579; Miller v. American, etc., Ins. Co., 20 L. R. A., 765, and note; Texas W. Ry. Co. v. Gentry, 69 Texas, 625; Steger v. Davis, 27 S. W. R., 1068; Lewis v. American Sav. Loan Assn., 39 L. R. A., 559, but see specially last column, page 567; Panhandle National Bank v. Emery, 78 Texas, 499.

KEY, ASSOCIATE JUSTICE.—The International Harvester Company of America brought this suit against the Deaton Grocery Company, a private corporation, seeking to recover on eleven promissory notes. Four of the notes were signed by E. W. Turner, four by Turner and H. J. Griffith, two by D. T. Sharpes, and one by G. A. Williams. None of them were signed primarily by the Deaton Grocery Company, but upon the back of each was the following endorsement:

"For value received, I hereby guarantee the payment of the within note, or any renewals or extensions thereof, and hereby waive protest, demand, notice of nonpayment and diligence, and agree to be liable thereon in the relation of comaker. (Signed)

"Deaton Grocery Company,
"Per G. W. Deaton."

The notes were payable to the Harvester Company, and it is alleged that all the other parties were insolvent and sought to hold the Deaton Grocery Company upon the guaranty above set out.

The defendant answered by general demurrer, general denial, plea of *non est factum,* failure of consideration, and that the contract of guaranty was *ultra vires,* and not binding upon the defendant, because under its charter as a private corporation it was without authority and had no power to make that contract. There was a jury trial resulting in a verdict and judgment for the plaintiff and the defendant has appealed.

Without considering in detail the various assignments of errors in appellant's brief, we decide one point in its favor, which decision renders it unnecessary to consider other questions.

By the terms of its charter appellant was incorporated for the

purpose of purchasing and selling goods, wares and merchandise and agricultural and farm products. Under well settled rules of law, it had no power to engage in or transact any other business than that specified in its charter. Of course, the power and authority conferred by the charter would authorize the corporation to .do many things incidental to the business for which it was incorporated, but it conferred no authority upon the corporation to act as a surety or guaranty company; and it could not, as a general rule, legally bind itself as a guarantor for other persons' debts in which it had no interest. Appellee sought to avoid the effect of the general rule referred to by alleging and endeavoring to prove that appellant was benefited by the guaranty contract, and therefore estopped from asserting its invalidity. On that point the case is substantially as follows:

The several notes were originally given for merchandise sold by the Harvester Company to the makers of the notes, and the Deaton Grocery Company received no part of the consideration for which the notes were given. E. W. Turner became obligated, either as original maker or guarantor for the payment of all the notes; and after they were due, and the Harvester Company sought to collect them, G. W. Deaton, the vice-president and general manager of the Deaton Grocery Company, at the request of E. W. Turner, signed the name of the Deaton Grocery Company to the contract of guaranty here involved, in consideration of which the Harvester Company agreed to extend the time of payment. At that time E. W. Turner was merchandising, and was indebted to the Deaton Grocery Company for merchandise which had been sold him, which indebtedness was secured by liens upon most of the property owned by Turner. At the time referred to, May 16, 1904, the testimony indicates that Turner was heavily in debt, but it does not show that he was insolvent, though in November thereafter he filed a voluntary petition of insolvency. Turner testified that on May 16, 1904, he had assets sufficient to pay all of his debts, and Deaton testified that he considered him solvent at that time. At any rate, he continued to run his business until the following November, and the Deaton Grocery Company continued to sell him goods; and, after the execution of the guaranty, collected from him about $12,000 or $15,000, but he was still indebted to the Grocery Company at the time he filed his bankruptcy petition. Stewart, a witness for appellee, testified that Deaton told him that Turner was indebted to the Deaton Grocery Company to such an extent that they could not afford for the Harvester Company to sue Turner, or cause him any trouble in regard to his business. So, it is contended on behalf of appellee that appellant derived a benefit from the contract of guaranty, because the making of it prevented a collapse in Turner's business earlier than it did occur, thereby enabling appellant, in part, to collect what Turner was owing it. Stewart, who was appellee's agent, further testified that he told Deaton that appellee was pressing Turner for payment; that he had instructions if Turner failed to pay to return the notes for suit; that Turner told him that he could not pay the notes then, and referred him to Deaton to help him

out; that Deaton told him he would see Turner about it, and if the appellee would agree to a reasonable extension, and Turner desired it, he would endorse the notes; and made the further statement that Turner was indebted to appellant to such an extent that he could not afford for appellee to sue him. This constitutes a summary of the testimony favorable to appellee, and does not include certain evidence submitted in behalf of appellant.

After careful consideration we have reached the conclusion that if it be conceded, which however was not shown, that Turner was insolvent at the time that the contract of guaranty was made, and that by reason of appellee's extension of time on its debt, appellant collected more from Turner than it otherwise would, still the contract of guaranty was *ultra vires,* and is not binding upon appellant; and, in support of this conclusion, the following authorities are cited: North Side Ry. Co. v. Worthington, 88 Texas, 562; South Texas Nat. Bank v. La Grange Oil Co., 40 S. W. Rep., 328; Bank of Genesee v. Patchin Bank, 19 N. Y., 312; Filon v. Miller, 60 Hun., 582; National Park Bank v. German-American Co., 116 N. Y., 281; Twiss v. Guaranty Life Ass'n, 43 Am. St. Rep., 418; Knickerbocker v. Wilcox, 21 Am. St. Rep., 595; Norton v. Derby Natl. Bank, 60 Am. Rep., 335; National Park Bank v. Remsen, 43 Fed. Rep., 226; Humbolt Mining Co. v. American Mfg. & Mining Co., 62 Fed. Rep., 357; Bridgeport City Bank v. Empire Stone Dressing Co., 30 Barb., 421; Morford v. Farmers Bank, 26 Barb., 568.

The statute of this State which authorizes the creation of private corporations declares that "No corporation created under the provisions of this title shall employ its stock, means, assets or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation." (Rev. Stats., art. 665.) If it be conceded that the statute quoted is no more than a reiteration of the common law upon the subject, nevertheless, the fact that it was incorporated into the statute is evidence of an intense legislative purpose to restrict corporations to the objects for which they were created. Clark & Marshall on Corporations lay down these rules:

"Ordinarily, in the absence of express authority, a corporation has no power to enter into a contract as surety or guarantor, and thus lend its credit to another corporation or person, for such an act is not usually necessary or proper in the conduct of its business. The objection to such a contract, said Judge Taft, 'is that it risks the funds of the company in a different enterprise and business under the control of another and different person or corporation, contrary to what its stockholders, its creditors and the State have the right from its charter to expect.' It can make no difference that the corporation is benefited by the contract or receives a consideration, if the contract is not within the scope of its business." (Sec. 184.)

"The rule that a corporation has such powers only as are conferred by its charter, is based upon the ground that a corporation derives its powers, as well as its existence, from the State, and not on the ground that the exercise of the powers not so conferred is

injurious to the corporation or its members. And it follows, therefore, that a corporation has no power to make contracts or engage in transactions which are foreign to the objects for which it was created, merely because such contracts or transactions will be beneficial to it. Nor can such powers be conferred by consent of the shareholders or by the by-laws adopted by them. It follows that an act which is not within the powers of a corporation can not be ratified by the stockholders, even though all may consent, so as to become valid." (Sec. 125.)

The leading case in this State is Northside Railway Co. v. Worthington, supra, and the following excerpt is taken from the opinion of Chief Justice Gaines in that case:

"It is contended on behalf of the plaintiffs in error, that the execution of the bonds was ultra vires, and that therefore they are void. In determining this question we may recur to a few leading principles. Corporations are the creatures of the law, and they can only exercise such powers as are granted by the law of their creation. An express grant, however, is not necessary. In every express grant there is implied a power to do whatever is necessary or reasonably appropriate to the exercise of the authority expressly conferred. The difficulty arises in any particular case, whenever we attempt to determine whether the power of a corporation to do an act can be implied or not. The question has given rise to much litigious controversy, and to much conflict of decision. It is not easy to lay down a rule by which the question may be determined; but the following as announced by a well-known text writer, commends itself not only as being reasonable in itself, but also as being in accord with the great weight of authority:

"'Whatever be a company's legitimate business, the company may foster it by all the usual means; but it may not go beyond this. It may not, under the pretext of fostering, entangle itself in proceedings with which it has no legitimate concern. In the next place the courts have however determined that such means shall be direct, not indirect; i. e., that a company shall not enter into engagements, as the rendering of assistance to other undertakings from which it anticipates a benefit to itself, not immediately, but mediately by reaction, as it were, from the success of the operations thus encouraged—all such proceedings inevitably tending to breaches of duty on the part of the directors, to abandonment of its peculiar objects on part of the corporation.' Green's Brice's Ultra Vires,' 88.

"In short, if the means be such as are usually resorted to and a direct method of accomplishing the purpose of the incorporation, they are within its powers; if they be unusual and tend in an indirect manner only to promote its interests, they are held to be ultra vires. For example, a railroad company may establish and maintain refreshment houses along its line for the accommodation of its passengers. Flanagan v. Great Western Ry., L. R., 7 Eq., 116. Such establishments are not unusual, are strictly subordinate to the main purpose for which such companies are created, and tend immediately to increase their traffic. So it has been held that a railroad corporation has the power to contract with the owner of a steam vessel

to maintain a through traffic and carry beyond its line, and that it can recover of the owner of such vessel damages to goods resulting from its unseaworthiness, for which the company has had to pay. South Wales Ry. Co. v. Redmond, 10 C. B. (N. S.), 675. It is now generally recognized that a railway company may contract to carry beyond its line, and it would seem to follow that a reasonable traffic arrangement with another carrier for through transportation is legitimate. On the. other hand, in Coleman v. Eastern Counties Ry. Co., 10 Bea., 1, the performance of a contract by which the company sought to establish a line of steamships between a terminus of one of its branches and a foreign port, and by which it attempted to guarantee a dividend on the venture, was enjoined. Upon a hasty consideration the two cases may appear not clearly distinguishable; but we think them entirely consistent, and ˙ that they well illustrate the rule which we have stated. In the former the contract was subsidiary to the legitimate business of the company, and was such as was reasonable and appropriate to a railroad, one of the termini of which was upon the seashore. It tended directly to increase the traffic of the company. In the latter, the establishment of the line of steamships was not subordinate to the business of the railroad company, but was in its nature a distinct enterprise. It tended to increase the business of the port to which the company's branch line extended, and the increase of the business of the port tended to increase the traffic of the railroad; but this was a mediate and not a direct result.

"As illustrative of the principle which we have announced, we call attention to some cases in addition to those already cited.

"In Davis v. Old Colony Ry., 131 Massachusetts, 258, it is held that it is beyond the powers of a railway company or of a corporation organized under the general statutes of Massachusetts for the manufacture and sale of musical instruments, to guarantee the payment of the expenses of a musical festival. The opinion in that case is by Chief Justice Gray, and is a very able and exhaustive discussion of the question.

"In Pearce v. Madison & I. Ry. Co., 21 Howard, 441, it was held that two railroad companies which had consolidated were not authorized to establish a steamboat line to run in connection with their railroads.

"In Plymouth⁻ Ry. v. Colwell, 39 Pa. St., 337, it was decided that a railway company was not authorized by its charter to maintain a canal.

"In Tomkinson v. Southern-Eastern Ry., L. R., 35 Chancery Division, 675, it was held that a proposed subscription by the company to an institution known as the 'Imperial Institute,' was not prevented from being ultra vires by the fact that the establishment of the institute might benefit the company, by causing an increase of passenger traffic over their line.

"To these cases others might be added, but they are sufficient to illustrate the doctrine that a corporation, created for the purpose of carrying on a business under a statute which merely states the

nature of the business and does not further define its powers, may exercise such powers as are reasonably necessary to accomplish the purpose of its creation; and it may be such as are usually incidental in practice to the prosecution of the business and no more. See Chewacla Lime Works v. Dismukes, 87 Ala., 344; Searight v. Payne, 6 Lea. (Tenn.), 283.

"These principles applied to the facts of this case, lead to the conclusion that neither the Fort Worth City Company nor the Northside Street Railway Company had the power to extend its credit to foster the interests of the other company. Viewed in the light of the peculiar facts of the case, it is apparent that the building up and settlement of the suburb tended to increase the business of the street railway which connected that suburb with the city of which it was the outgrowth. On the other hand, it is equally clear that the establishment of the street railway tended to promote the enterprise of the other corporation. It is also clear that the establishment and maintenance of a street railway is not an object which was expressed in the articles of incorporation of the city company, and that the building up of an addition to a city is not a purpose expressed in the charter of the other corporation. That the success of the one enterprise tended to promote the success of the other was not itself sufficient to authorize the one corporation to aid the other, for the reason that the benefit which was to accrue was not the direct result of the means employed.

"The transaction in controversy, when properly analyzed and stripped of its form, is one in which the two corporations agreed to borrow a sum of money to be divided between them, and that each should become the surety for the other for the amount received by such other. It is too well settled to require the citation of authority, that a corporation of the character of those in question, in the absence of statutory authority, can not bind itself by accommodation paper executed for the benefit of another party. It follows, that if either corporation in this case is to be held bound for more than its proportionate amount of the debt incurred, it must be upon the ground that it had power to aid in the prosecution of the business of the other.

"Did the street railway company have such power? If it is to be held that because of the indirect benefits which would result to it from the success of the enterprise, it was authorized by the law to aid in building up the suburbs of the city company, then it should also be held that it had the power to employ its funds and and its credit in fostering any other undertaking which was calculated to increase the population of the city of Fort Worth or of any portion of the territory which lies along its line. The effect of that ruling would be to empower every business corporation not only to carry on the very business it was created to prosecute, but also to engage in every enterprise which would tend to increase the volume of its principal business and the revenues to be derived therefrom. This would leave the scope of its operations without any reasonable limit. That such is not the law, the authorities already cited are sufficient to show. Street railways are projected for

the carriage for hire of people living within and near cities and towns. Street railway companies are chartered for the specific purpose of establishing and operating street railways, and not to increase the population of the towns and cities through which they are established—though their operation may have that effect, and though an increase of population may result indirectly to their benefit.

"The same principles apply to the case of the Fort Worth City Company. The general law in force at the time this corporation was created provided, that a private corporation might be formed for the purpose, among others, of 'the purchase, subdivision and sale of lands in cities, towns and villages.' Laws 1885, p. 59. We construe this to give the power to purchase lands, and to lay them off into streets, blocks and lots and to sell them in subdivisions for the purpose of profit. Many enterprises suggest themselves which might be entered into by such a corporation, which would tend to promote the success of the undertaking. As a general rule, there is probably none that would be better calculated to produce that effect than the construction and maintenance of an ordinary railroad. But can it be said that such a corporation has the power to embark its capital in such an enterprise? A limit must be laid down as to the implied powers of a corporation; and with reference to a company chartered for a business purpose, we think the proper line of demarcation is between those powers which are reasonably necessary to the business, or which are usually incident to its prosecution, and those which are not."

There is no merit in appellee's contention that appellant is estopped from denying its liability. If the doctrine of estoppel can be invoked to defeat a plea of ultra vires, such doctrine has no application to this case. Appellee is not in the attitude of an innocent purchaser or holder without notice. At the time that the contract of guaranty was made the law charged it with notice of the fact that the Deaton Grocery Company had no power to make that contract, and that, for that reason, the contract was null and void. The Deaton Grocery Company received nothing from appellee or anyone else as a consideration for making the contract; and therefore is not now withholding from appellee or anyone else anything received by it upon the contract. For these reasons the facts fall short of what is necessary to constitute an estoppel.

Placing upon the testimony the most favorable construction contended for by appellee, our conclusion is that the contract sued upon is void, and appellant is not liable thereon; and, for that reason, the judgment will be reversed and here rendered for appellant.

*Reversed and rendered.*

Writ of error refused.