McCALEB et al. v. BOERNE ELECTRIC
POWER & MFG. CO. et al.†
(No. 5410.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 3, 1915. Rehearing Denied March 3, 1915.)

CORPORATIONS ☞467—POWERS—ULTRA VIRES ACTS.

Under Vernon's Sayles' Ann. Civ. St. 1914, arts. 1164, 1165, providing that no corporation shall employ its assets for any purpose other than to accomplish the objects of its creation, and shall not create any indebtedness except for money paid or labor done or for property actually received, a corporation organized under Rev. St. 1911, art. 1121, subd. 29, for the accumulation and loan of money has no authority to bind itself as accommodation indorser as against one having knowledge that it is an accommodation indorser.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1831; Dec. Dig. ☞467.]

Appeal from District Court, Kendall County; R. H. Burney, Judge.

Action by the Globe Fire Insurance Company against the Boerne Electric Power & Manufacturing Company and others, in which Walter F. McCaleb and the West Texas Bank & Trust Company intervened. From a judgment in favor of defendant the Farmers' Mortgage Loan Company, the interveners appeal. Affirmed.

Swearingen & Ward, J. H. Bickett, Jr., and H. C. King, Jr., all of San Antonio, for appellants. Kampmann & Burney and McFarland & Lewright, all of San Antonio, for appellees.

FLY, C. J. This suit was instituted by the Globe Fire Insurance Company against the Boerne Electric Power & Manufacturing Company and ten individuals and the Farmers' Mortgage Company, to recover upon a promissory note for $10,000, executed by the electric company in favor of the mortgage loan company, and indorsed by the latter to the insurance company, and also to foreclose a deed of trust given by the electric company to secure the note. It is unnecessary and unprofitable to set out the various and sundry amendments of the pleadings; it being sufficient to state that the insurance company in its first amended original petition made additional parties, alleging that they were members of the electric company, "an alleged corporation," and formed a copartnership, and prayed for judgment against them individually, or, in the alternative, against the corporation, if it was found by the court that it was a corporation. The Farmers' Mortgage Loan Company, in its third amended original answer, alleged that the electric company was not legally incorporated, and that the individual defendants were liable on the note as partners; that its act in indorsing the note was ultra vires, which was known to appellant;

that it was not liable as an indorser because the note had not been protested for nonpayment, and suit had not been filed at the first or second term after it became due against the maker, and asked, in case of a recovery against it, for judgment over against all the other defendants. Walter F. McCaleb and the West Texas Bank & Trust Company filed pleas in intervention, alleging that the Boerne Electric Power & Manufacturing Company was a corporation duly organized and incorporated under the laws of Arizona, and that McCaleb had become the owner and holder of the note during the pendency of the suit; and the West Texas Bank & Trust Company alleged that the note and mortgage had been deposited with it as security for a loan made by it to said McCaleb.

The cause was tried by jury, and, upon hearing the evidence, the court instructed the jury to return a verdict in favor of McCaleb against the Boerne Electric Power & Manufacturing Company for the amount of the note and for foreclosure of the lien as evidenced by the deed of trust, and to find that the note and mortgage were held by the West Texas Bank & Trust Company as collateral security for a loan made to McCaleb, and to return a verdict in favor of the Farmers' Mortgage Loan Company. As instructed, the verdict was returned, and judgment was accordingly rendered thereon. This appeal is prosecuted by W. F. McCaleb and West Texas Bank & Trust Company.

There are ten assignments of error, which, taken together, amount to the contention that the court should not have instructed a verdict in favor of the Farmers' Mortgage Loan Company, but should have instructed a verdict in favor of the intervener W. F. McCaleb. This requires a review of the facts.

In 1912 the electric company was in debt, owing the West Texas Bank & Trust Company over $6,000, and the Boerne State Bank $3,500. C. J. Loe was president of the electric company, and also of the Boerne State Bank. The electric company desired to raise the sum of $10,000 to pay off its indebtedness, and it executed to the Farmers' Mortgage Loan Company its note for $10,000 and executed a deed of trust on its property to secure the loan. The mortgage loan company indorsed the note and deed of trust to the Globe Fire Insurance Company. The application for the loan was made to the insurance company by the electric company, but also, after considering the matter for some time, the insurance company demanded the indorsement of the mortgage loan company and of C. J. Loe. Up to that time the loan company had never been mentioned in the transaction, and then it was spoken of as the "trust company," but it was shown that the mortgage loan company was meant. The West Texas Bank & Trust Company was

engaged with the insurance company in negotiating for the loan, for as early as March 29, 1912, McCaleb, president of the bank, wrote Loe, president of the Boerne State Bank, in regard to the loan. All of them knew that the Farmers' Mortgage Loan Company received nothing for the indorsement of the note, did not own it, had no conceivable interest in it, and were charged with the knowledge that the mortgage loan company had no power or authority to act as a guarantor or surety.

Fully three months had been consumed in negotiations for the loan to the electric company, when it occurred to the insurance company that it desired the indorsement of the mortgage loan company on the notes. The insurance company knew the details of the loan; knew it was for the benefit of the electric company; knew that it was in part to pay a debt to the bank and trust company; and, as it had the mortgage loan company to indorse the notes, knew that the latter had no interest in the note. The insurance company at least had full knowledge that the notes were for the benefit of the Boerne Electric Power & Manufacturing Company, and that the mortgage company had no interest in it whatever, McCaleb, the president of the West Texas Bank & Trust Company, was in on the deal in the interest of his bank, and he testified:

"I understood the real beneficiary of the transaction was to be the Boerne Electric Power & Manufacturing Company, and in the last analysis was to get the $10,000. I think it was understood that the $10,000 note was to take up the indebtedness. I understood that to be a fact when I acted as a member of the finance committee of the Globe Fire Insurance Company."

That he was representing his bank appears from his testimony:

"I knew at the time that the Boerne Electric Power & Manufacturing Company owed a note to the West Texas Bank & Trust Company which was overdue, which was to be retired out of the loan; but, as to the proceeds, I knew nothing and cared nothing for it."

He also stated:

"Mr. Loe discussed with me the condition of the Farmers' Mortgage Loan Company prior to this loan."

Why should the president of the bank be discussing the financial condition of the mortgage company before the loan except as to its being sufficient security for the $10,000 that was to be loaned to the electric power company. McCaleb was not only interested in lending the money for the insurance company, but he was also interested, as president, in getting the bulk of the loan to pay the over-due debt of the West Texas Bank & Trust Company.

The evidence presents a fine object lesson on the subject of interlocking directorates and officials, a system that has had a most baleful influence on the business of the country. C. J. Loe was the president of the electric power company, which owed $3,500 to the Boerne State Bank, of which Mr. Loe was president. His electric company also owed the West Texas Bank & Trust Company over $6,000; so he desired to raise $10,000 to pay off the indebtedness to the two banks. As president of the Boerne Electric Power & Manufacturing Company, he sought to borrow the $10,000, and went to the insurance company of which McCaleb, president of the West Texas Bank & Trust Company, was a committeeman on finances, and it was agreed that the insurance company would lend the money, if the Farmers' Mortgage Loan Company and Mr. Loe would indorse the note of the electric power company. Mr. Loe was not only president of the electric company and president of the Boerne State Bank, but he was also president of the Farmers' Mortgage Loan Company. He declined to immolate himself on the note, but was willing to make a vicarious sacrifice of his Farmers' Mortgage Loan Company on the note of his insolvent electric power and manufacturing company, and a note for $10,000 payable to the order of the Farmers' Mortgage Loan Company was drawn up and signed by the Boerne Electric Power & Manufacturing Company, acting by its president, C. J. Loe, and then was indorsed by the Farmers' Mortgage Loan Company, "by C. J. Loe, Pres." Poo Bah, in the musical comedy of Mikado, did not occupy more offices and do more in them than these interlocking directorates of four corporations. The money was forthcoming from the insurance company; a large portion of it going to pay McCaleb's bank and the other to pay Loe's bank. To argue that every one connected with the plan for raising the money did not know all of its details would be to argue in the face of the facts, reason, and common sense. They all knew that the credit of the mortgage loan company was being pledged to secure a debt in which it did not have a dollar's interest, and all of them were charged with the knowledge that the mortgage loan company, under its charter, had no power or authority to act as a surety on promissory notes in which it could have no possible interest. It did not, in fact, receive anything whatever from the transaction. If it had no power to act as a surety on the note of another, the promise of the maker of the note to pay it $100 as surety would not render the transaction legal. Surety companies are chartered to act as sureties and receive pay therefor, and they alone. The Farmers' Mortgage Loan Company did not lend any money to the electric power company, had no interest in that company, and had no right, power, or authority to guarantee payment of any of its debts.

Webster, who was president of the insurance company, testified that he knew nothing about where the proceeds of the note were to be applied, but, if so, he was the only one connected with his corporation that did not

know. He stated that the Boerne Electric Power & Manufacturing Company was the owner of the note when he bought it for his company, but how it could have been the owner of a note executed to another by itself, unless the payee was placed in the note to indorse the note for the maker's benefit, is not explained, and cannot be explained. It is true this witness testified that he bought the note belonging to the maker from the indorser, but he must have known that the indorsement was one merely for accommodation. He may have been ignorant of the facts, but his corporation knew. The finance committee of the insurance company knew how the money was to be applied, if its president did not. W. F. McCaleb testified that they made the loan, and that they knew "that $6,000, and interest, should come out of the loan whenever consummated, to cover its indebtedness to the West Texas Bank & Trust Co." Webster, president of the Globe Fire Insurance Company, may not, as he swore, have known that the money was for the electric power and manufacturing company, but the corporation knew it, for it was entered on its minutes on March 27, 1912, that the application to the insurance company for a loan of $10,000 to the Boerne Electric Power & Manufacturing Company be approved subject to the approval of McCaleb, Groos, and Webster. Again, the loan was approved on May 24, 1912, "as based on letter written them [Boerne Electric Power & Manufacturing Company] by Mr. Webster on April 29, 1912." On April 29, 1912, a letter written by the Globe Insurance Company, "Van A. Webster, President," was sent to C. J. Loe in regard to "the loans submitted by you for the Boerne Electric Power & Mfg. Co." Yet Mr. Webster swore that he did not know that the loan was being made to the electric power company. He, however, on cross-examination, seemed to remember that letter, and admitted that his company considered the loan to the electric power company, but insisted that he still thought the money was being loaned to the Farmers' Mortgage Loan Company. McCaleb, of the finance committee of the insurance company and president of the West Texas Bank & Trust Company, approved the loan. The assistant secretary of the insurance company wrote Loe, as president of the electric power and manufacturing company, that the loan had been approved. The attorney of the insurance company knew all about the loan to the electric power company. It would seem that every one connected with the insurance company should have known about the loan to the electric power company, although the president swore he knew nothing about it.

It was admitted that the Farmers' Mortgage Loan Company was chartered under the provisions of subdivision 29 of article 1121 of the Revised Statutes which is as follows:

"The accumulation and loan of money; but these subdivisions shall not permit incorporations with banking or discounting privileges."

In subdivision 37 of the same article corporations are permitted to be incorporated "to act as surety and guarantor," but no such power was granted to the Farmers' Mortgage Loan Company. This was, in effect, what was attempted by that company in taking a note to itself and indorsing it to another corporation in order to raise money for still another corporation, which was the maker of the note. It undoubtedly had no such authority, and all the parties to the loan were charged with knowledge of such lack of authority. The Farmers' Mortgage Loan Company received no consideration for its indorsement, but, if it had, that would not change the condition of affairs. It received no part of the proceeds of the loan for which the note was executed, and is not liable thereon. It was a direct attempt to lend the credit of one corporation chartered for specific purposes to another chartered for other purposes, which attempt was null and void. Northside Railway Co. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778; Gaston v. Campbell, 104 Tex. 576, 140 S. W. 770, 141 S. W. 515; Bank v. Oil Mill Co., 40 S. W. 328; Deaton v. Harvester Co., 47 Tex. Civ. App. 267, 105 S. W. 556; Deposit Co. v. Bank, 48 Tex. Civ. App. 301, 106 S. W. 784; Carla Land Co. v. Bank, 164 S. W. 1066.

The act of the Farmers' Mortgage Loan Company in indorsing the note for the Boerne Electric Power & Manufacturing Company was gratuitous, without consideration, and directly in the face of the statute, which is declaratory of the common law. Vernon's Sayles' Stats. articles 1164, 1165. In the last-named article it is provided:

"No corporation, domestic or foreign, doing business in this state, shall create any indebtedness whatever except for money paid, labor done, which is reasonably worth at least the sum at which it was taken by the corporation, or property actually received, reasonably worth at least the sum at which it was taken by the corporation."

What money was paid, what labor done, or property actually received by the Farmers' Mortgage Loan Company in consideration of the creation of the indebtedness evidenced by the indorsement of the note to the Insurance Company? It is not claimed that the mortgage loan company received anything for indorsing the note. Appellants not only knew that the mortgage loan company received nothing for the indorsement, but were parties to the procurement of a violation of the law.

If the Farmers' Mortgage Loan Company had the right under its charter to sell and indorse bona fide notes executed to it, that authority could not save appellants in this case, because appellants and the insurance company knew that the note was not executed for a debt due by the electric power company to the mortgage loan company, but

that the note was executed to obtain a loan for the payor of the note, and not for the payee. The insurance company and McCaleb devised the plan to obtain the indorsement of the mortgage loan company, and the West Texas Bank & Trust Company, through its president, knew of the plan. It was planned and executed by all of the parties.

One of the propositions under the first assignment of error is:

"The undisputed evidence showing that the defendant Farmers' Mortgage Loan Company, the payee in said note, for a full and valuable consideration, indorsed, transferred, assigned, and delivered said note before maturity to the Globe Fire Insurance Company, said defendant is thereby estopped from asserting that it had no authority under its charter to indorse said note, and to bind itself as indorser thereof."

The proposition might be tenable if the evidence showed that the Farmers' Mortgage Loan Company indorsed the note for "a full and valuable consideration" to an innocent purchaser of the note. But there is not one word of testimony in the record that shows that the Farmers' Mortgage Loan Company received one cent for its indorsement, but the "undisputed evidence" is directly to the contrary and all of the testimony tends to show that the insurance company not only knew that there was no consideration for the indorsement, but that it actually procured the indorsement to obtain security for money loaned to the Boerne Electric Power & Manufacturing Company. The authorities cited by appellants have no application to the facts of this case. There can be no doubt, as stated by Waterman in his work on Specific Performance (section 22c), that:

"It is now settled that a corporation cannot avail itself of the defense of ultra vires when the contract has been in good faith fully performed by the other party and the corporation has had the full benefit of the performance of the contract."

That is the sum and substance of the authorities, but they cannot have any force in a case where the corporation performed the ultra vires act at the request of the other party, and not only did not receive "the full benefit of the performance of the contract," but received none at all as the other party knew. As substantiating the assertion of this court, we quote the following from Kincheloe Irr. Co. v. Hahn, 105 Tex. 231, 146 S. W. 1187, which is cited by appellants:

"It may be stated as a rule of law that an action for damages for breach of contract will not be avoided by the plea of ultra vires, when the corporation has received benefits under the alleged * * * contract."

That case was carried to the Supreme Court from this court, and the quotation is sound law, although it had no more applicability to the facts of that case than it has to those in this case. The only point in that case was the power of the general manager to bind the corporation. The whole brief of appellant is based on hypotheses that are not sustained by the facts.

Corporations organized and incorporated for the purpose of the "accumulation and loan of money" may have the authority to "sell any paper taken or purchased by them at any price they may see fit to sell it," as quoted by appellant from an opinion from the Attorney General's office in February, 1914, but that would not authorize such corporation to indorse notes in order to raise money for another corporation. The language "for the accumulation and loan of money" cannot, by the most liberal construction, authorize a gratuitous indorsement for the benefit of another, and if the opinion from the Attorney General's office were authority, to be followed by the courts of Texas, still there is not one word or syllable in it upholding any such proposition.

It is contended that subdivision 37, art. 1121, does not provide for surety companies indorsing notes, and it is argued that such indorsement by a company organized for accumulating and lending money would not interfere with any privilege granted by that subdivision. But, if that were true, what about those incorporated under the provisions of subdivision 71 of the statute, which permits incorporation "for the purpose of guaranteeing and assuring the validity of bills of lading and other contracts"? However, in subdivision 37 the corporation is allowed to "guarantee any contract between private individuals or corporations," and clearly any guarantee for pay by a corporation organized under subdivision 29 would be an invasion of the field occupied under 37. But after all we return to the proposition that No. 29 does not authorize a corporation to lend its credit to another. The parties dealing with such corporation were charged with knowledge of the limits of its authority. As said by the Court of Civil Appeals of Georgia in Savannah Ice Co. v. Bank & Trust Co., 12 Ga. App. 818, 79 S. E. 45:

"Certainly the bank was not justified in assuming that charter authority had been granted. On the contrary, persons dealing with a corporation must assume that it has no power to use its assets or pledge its credit, except to subserve the interests of the stockholders and the enterprise which the corporation is authorized to carry on."

The transaction in this case disclosed on its face that the Farmers' Mortgage Loan Company was pledging its credit not to forward its interests, not to obtain money for itself, but to get money to pay the debts of another corporation. They knew the indorser of the note could not have secured itself, because they knew that they had a lien on all the property of the maker of the note to secure the note given to obtain money to pay the debts of an insolvent corporation. They knew the actual facts surrounding the transaction, but, independent of those, the very transaction itself gave them notice that the Farmers' Mortgage Loan Company was an accommodation indorser.

The judgment is affirmed.