## FARRACY v. SECURITY NAT. BANK OF DALLAS et al. (No. 10155.)

Court of Civil Appeals of Texas. Dallas.
Feb. 25, 1928.

Rehearing Denied March 31, 1928.

1. **Banks and banking** ⊙112—**Discharge of corporate notes substituted for personal notes of officers, at instigation of bank officer, held unlawful "diversion of corporate funds" rendering bank liable (Rev. St. 1925, arts. 1348, 1349).**

Where president of corporation executed corporate notes and substituted them for personal notes of president and another officer held by bank, with knowledge and at instigation of cashier and vice president of bank, *held*, that use of corporate money to discharge such substituted notes was an unlawful diversion of funds of corporation under Rev. St. 1925, arts. 1348 and 1349, for which bank was equally liable with the president and such officer.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Diversion—Divert.]

2. **Bankruptcy** ⊙151—**Trustee held vested with title to all property of estate and powers possessed by bankrupt and also with rights of execution creditor (Bankruptcy Act, §§ 47, 70[a], [e] [11 USCA §§ 75, 110 (a), (e)]).**

Under Bankruptcy Act, §§ 47, 70 (a), (e) (11 USCA §§ 75, 110 [a], [e]), a trustee in bankruptcy is not only vested with title to all property owned by the estate and all powers in reference to such property that bankrupt possessed before bankruptcy, but also with all rights of an execution creditor.

3. **Bankruptcy** ⊙185—**Trustee can avoid any unlawful transfer that bankrupt or lien creditor could have avoided (Bankruptcy Act §§ 47, 70[a], [e] [11 USCA §§ 75, 110(a), (e)]).**

Under Bankruptcy Act, §§ 47, 70 (a), (e) (11 USCA §§ 75, 110 [a], [e]), trustee in bankruptcy can avoid any unlawful transfer of property that bankrupt could have avoided at time of adjudication and any such transfer that credi-

tor holding a legal or equitable lien could have avoided, regardless of whether, at time of unlawful transfer, bankrupt was solvent or insolvent.

**4. Bankruptcy ⚖️178(1)—Trustee held authorized to recover amounts paid bank on corporate notes of bankrupt corporation unlawfully substituted for personal notes of bankrupt's officers (Bankruptcy Act, §§ 47, 70 [a], [e] [11 USCA §§ 75, 110 (a) (e)]).**

Where, at instigation of bank officer, corporate notes were substituted for personal notes of corporate officers and corporate notes discharged and corporation became bankrupt, *held,* that under Bankruptcy Act, §§ 47, 70(a) (e) (11 USCA §§ 75, 110[a], [e]) trustee can recover from bank amount paid in discharge of such notes.

**5. Bankruptcy ⚖️182—Bank held bona fide holder for value of corporate note not liable to trustee in bankruptcy of corporation for amount paid in discharge of it (Bankruptcy Act, § 70 [e] [11 USCA § 110 (e)]).**

Bank taking over assets and assuming liabilities of another bank *held* a bona fide holder for value of corporate note which had unlawfully been substituted for personal note of corporate officer, and was not liable under Bankruptcy Act, § 70 (e) (11 USCA § 110 [e]) to trustee in bankruptcy of corporation for amount paid in discharge of such note.

Appeal from District Court, Dallas County; Joel R. Bond, Judge.

Action by Harry D. Farracy, trustee in bankruptcy, against the Security National Bank of Dallas and another. Judgment for defendants, and plaintiff appeals. Reversed and rendered in part, and affirmed in part.

Davis, Synnott & Hatchell, of Dallas, for appellant.

Touchstone, Wight, Gormley & Price, of Dallas, for appellees.

JONES, C. J. Appellant, Harry D. Farracy, trustee in bankruptcy for the estate of L. H. Lewis Company, bankrupt, has duly appealed from an adverse judgment entered against him in the trial of this suit in the district court of Dallas county and in favor of appellees, the Security National Bank of Dallas and the Southwest National Bank of Dallas. The suit was instituted by appellant, and had for its purpose the recovery from appellees, as a part of said bankrupt estate, the sum of $43,000, alleged assets of said estate in the possession of appellees.

The facts upon which this suit is based are: The L. H. Lewis Company was incorporated in June, 1919, for the purpose of conducting a wholesale dry goods business in the city of Dallas, with a capital stock of $500,000, represented by 5,000 shares of stock of the par value of $100 per share. The affidavit attached to the articles of incorporation showed that L. H. Lewis had subscribed for 3,000 shares of said stock, and had paid in $150,000 in cash; that J. H. Webb had subscribed for 500 shares of said stock and had paid in $25,000; that Cull C. Moorman had subscribed for 1,500 shares of said stock and paid in $75,000, thus showing that all of the capital stock of the corporation had been subscribed by these three incorporators and 50 per cent. paid in. As a matter of fact, however, a number of other parties at the time the organization was perfected held a considerable portion of the capital stock and had paid therefor.

The organization was perfected during the months of June and July, and as soon as possible thereafter the corporation was opened for the transaction of the business authorized under its charter. The first meeting of stockholders was held, a board of nine directors elected, and by-laws adopted. At the first meeting of the board of directors, L. H. Lewis was elected president, Cull C. Moorman vice president, and J. H. Webb secretary. Under the by-laws, the affairs of the corporation were placed under the management of its board of directors and such officers and agents as the board "may elect or employ." Among other powers vested by the by-laws in the president was that—

"He shall sign all checks, all certificates of stock, conveyances of real estate, and any other instruments in writing requiring a signature, and perform such other duties as may be required of him from time to time by the directors."

The president was authorized to negotiate at any and all times, and in such manner as he might see fit, for the necessary funds for the proper financing of the business of the corporation and empowered "to sign such notes, or instruments in writing as may be necessary from time to time for the securing of such sums of money as the business of L. H. Lewis Company may require."

Edwin H. Hobby was a vice president and cashier of appellee the Security National Bank, and an initial stockholder in the L. H. Lewis Company. Cull C. Moorman was also a vice president of the Security National Bank.

At the time the Lewis Company opened for business, all of its authorized capital stock had been paid in. It is important to note the circumstances attending the payment to said company of $50,000 for 500 shares of capital stock, issued to Lewis and Webb subsequent to the issuance of the charter, but prior to opening business. These circumstances are: While the Lewis Company was in course of organization, Mr. Lewis, the chief mover in the organization, in an interview with the Security National Bank through its cashier, Edwin H. Hobby, informed the bank that he desired the company to open business with the credit of having all its capital stock fully paid up, but that he also desired that 500 shares of the capital stock should not be

---

immediately issued to individuals but carried by the L. H. Lewis Company in the nature of treasury stock, so that if it was considered best for the Lewis Company to have desirable parties or future employés to become financially interested in such company, this stock would be available for such purpose. His plan was for the bank to advance to the company $50,000 with this capital stock as collateral, but for this to be done in such a way as not to lessen the amount of credit that the company with its capital stock fully paid up would be normally entitled to. The plan to carry the 500 shares as treasury stock was not adopted by the bank, but, in lieu thereof, it was agreed that Lewis would execute to the bank his personal note for $35,000 and Webb his personal note for $15,000, and with the proceeds of his note, Lewis would take up 350 shares of his unpaid stock subscription, and Webb, with the proceeds of his note, would take up 150 shares of his unpaid stock subscription; that these notes would be carried indefinitely, or until the 500 shares were purchased by the desired parties. These notes were executed by the respective parties on the 15th of July, 1919, and the $50,000, as proceeds of such notes, was paid into the treasury of the L. H. Lewis Company, a certificate for 350 shares issued to Lewis, and one for 150 shares issued to Webb, and the said shares of each deposited with the bank as collateral security for their respective loans; Webb later placing as security an additional certificate for 100 shares.

Each note was renewed from time to time as it matured, by the respective makers, by the personal payment by each of the interest due thereon, until May 2d, 1921. Previous to this date Webb had paid $1,000 on the principal of his note. On this date, Hobby, as cashier and representative of the Security National Bank, demanded of Lewis that he, as president of the L. H. Lewis Company, substitute the company's notes for these individual notes of Lewis and Webb. It was explained by Hobby that he knew the agreement was to carry these notes indefinitely for Lewis and Webb, and that he did not intend to repudiate such agreement, but that the bank examiner was present and that it had become necessary that the indebtedness be carried for a time by the company until the "present flurry" was over. To this proposition, Lewis at first strongly demurred on the grounds, first, of the agreement, and, second, that he was unable to do so without putting the matter before the directors of the Lewis Company, but, on the insistence of Hobby that the change must be made and that the old manner of carrying this indebtedness would be restored in a short time, Lewis reluctantly consented, and, in lieu of the individual notes representing the $49,000 indebtedness of Lewis and Webb, he executed four notes of the L. H. Lewis Company, aggregating the said sum of $49,000, all of said notes being signed in the usual way the Lewis Company executed such an evidence of indebtedness, viz.: "L. H. Lewis Company by L. H. Lewis, President." These four notes were executed on May 2, 1921, and bore on their face nothing to disclose the fact that they were executed to take up the individual indebtedness of Lewis and Webb. The first of said notes was for the principal sum of $9,000 and matured in 30 days; the second was for the principal sum of $10,000 and matured in 60 days; the third was for the principal sum of $10,000 and matured in 90 days; the fourth was for the principal sum of $20,000, and matured in 90 days. Each of said notes was indorsed by L. H. Lewis, but it appears that all other notes executed to creditors by the Lewis Company likewise bore his indorsement. Except as to the fourth, all of these notes were paid by the L. H. Lewis Company as they respectively matured. The fourth note, for $20,000, has never been paid, but on August 1, 1921, was duly renewed by the L. H. Lewis Company by a note in the same amount payable to the Security National Bank. Some time after this first renewal, and before its maturity, it became the property of appellee the Southwest National Bank, and subsequent renewal of said note was had through said bank. There was nothing on the face of this first renewal note for $20,000 to show that it was a renewal of a note that had theretofore matured. The last renewal of this note matured in January, 1923.

On February 13, 1923, an involuntary petition in bankruptcy was filed in the United States District Court at Dallas against the L. H. Lewis Company. Thereafter a voluntary petition in bankruptcy was filed by the L. H. Lewis Company, and, on or about March 1, 1923, these two causes were consolidated and the L. H. Lewis Company duly adjudged a bankrupt. Subsequently appellant was duly appointed trustee of the bankrupt's estate, immediately qualified as such, and since which time has been acting as such trustee.

On May 2, 1921, the date on which the four notes of the L. H. Lewis Company were substituted for the individual notes of Lewis and Webb, the L. H. Lewis Company was solvent, in that its liabilities were less than its assets, but at such time it owed between $700,-000 and $800,000, and its credit was somewhat impaired. On such date the American Exchange National Bank of New York was a creditor of L. H. Lewis Company to the amount of $36,239.05, and continued creditor in such amount until the L. H. Lewis Company was adjudged a bankrupt. The said bank's claim in such amount was duly allowed by the bankrupt court as an unsecured claim. In all, 297 unsecured creditors prepared and filed proofs of claim and had same allowed. The sum total of all these claims amounted to $335,851.84. To these creditors, including the American Exchange National Bank of New York, there has been paid by

the trustee a 70 per cent. dividend. It is contemplated that an additional dividend of 5 per cent. will be ordered, but will exhaust the assets now in the hands of the trustee. It appears, therefore, that at the time of the trial of this cause each unsecured creditor would sustain a loss of 25 per cent. of his claim, or a total loss would be sustained by all of such creditors of $83,962.96, an amount in excess of the amount here claimed.

The Southwest National Bank was organized on or about July 1, 1921, and on or about July 19, 1921, the Security National Bank of Dallas transferred and assigned to the Southwest National Bank the major portion of its assets, and the Southwest National Bank assumed the liabilities of the Security National Bank, except as to its stockholders. This agreement between appellees was evidenced by a written contract. By this contract, the Security National Bank obligated itself to sell, assign, and deliver any and all of its assets of any kind and description, except its corporate name and charter, to the Southwest National Bank. All notes, bills of exchange, or other evidences of indebtedness owned by the Security National Bank were to be indorsed by its officers duly empowered to do so to the Southwest National Bank. It also obligated itself to execute and deliver all and any deeds necessary to convey title in any real estate it owned, and to transfer and deliver all bank balances due from other banks, by means of drafts or otherwise, to the Southwest National Bank. In consideration thereof, the Southwest National Bank obligated itself to assume all the liabilities of the Security National Bank, except that to its shareholders, and agreed to select from the assets of the Security National Bank a sufficient amount of assets to equal in value the liabilities assumed; and further agreed to set up on its books a credit to the amount of $500,000 to the account of the shareholders of the Security National Bank to be used by them in the purchase of stock in the Southwest National Bank. To reimburse itself for the credit, the Southwest National Bank was to select assets of the Security National Bank in the value of said sum. It was further agreed that the Southwest National Bank, after it had selected the assets heretofore provided for, was then to select assets to the value of $500,000 as additional consideration for the assumption of the liabilities of the Security National Bank and for other services performed and to be performed by the Southwest National Bank. It was provided that the then remaining assets should be delivered to the Liberty Investment Company as agent, or other duly appointed liquidating agent, for the use and benefit of shareholders, but subject in all things to a preference lien on such remaining assets to R. W. Higgenbotham.

The transaction of May 2, 1921, in which the individual notes of Lewis and Webb were taken up by the four notes of the L. H. Lewis Company, was never brought before any meeting of the directors, and nothing occurs in the minutes of directors' meetings on this subject. When the substitution was had, the notes of Lewis and Webb were delivered to Lewis, duly canceled, and Lewis delivered Webb's canceled note to him, and both of such notes were destroyed. An entry of bills receivable for the amount of this indebtedness was made in the books of the Lewis Company, and the certificates of stock of each, that were held as collateral security by the Security National Bank, were delivered to the company and deposited in its vaults. No transfer of such stock to the company was ever entered on the books. No notes to the company for the indebtedness of either Lewis or Webb was ever executed by either of them. A certificate representing 100 shares of the Lewis Company stock, that had been deposited by Webb in excess of the 150 shares, was returned to him. Certificates representing the 350 shares owned by Lewis, and the 150 shares owned by Webb, were in the possession of the company at the time of the bankruptcy.

On two occasions subsequent to May 2, 1921, and inferentially before any of the notes executed on such occasion by L. H. Lewis Company had been paid, L. H. Lewis attempted to get Hobby to restore the former status of this indebtedness, but without avail, although there was at each time a promise to do so. On one of these occasions Lewis was rather insistent, stating in effect that the company had all of its own burdens it could bear.

At the time the 70 per cent. dividend in the bankrupt's estate was declared, neither appellant, as the trustee in bankruptcy, nor his attorney, knew of the history of the $20,000 note executed by L. H. Lewis Company to the Security National Bank, and did not know of this history nor the source of such note at the time the $14,000 dividend was paid to the Southwest National Bank. There is no evidence that the Southwest National Bank knew the history or source of the $20,000 note at the time it was selected as an asset of the Security National Bank or at the time it received the dividend.

Under authority of the bankruptcy court, the appellant filed this suit to recover from appellees the $29,000 paid to the Security National Bank, in liquidation of the three notes above described, on the theory as against the Security National Bank that the execution of the three notes by the L. H. Lewis Company was wholly unauthorized and beyond the power of the president, L. H. Lewis, to execute them, and that the payment of said notes was a wrongful diversion of the money and assets of said company, and that all of such facts were known to Edwin Hobby, the cashier and vice president of said bank. All of the facts are set up in the petition with great particularity, and it was further al-

leged that such matter constituted a fraud on the L. H. Lewis Company and on its creditors. He seeks to hold the Southwest National Bank on the said claim of $29,000 on the agreement entered into to assume the liabilities of the Security National· Bank. He seeks to recover the $14,000 dividend paid to the Southwest National Bank on virtually the same theory. Appellees raised by defensive pleading all the · questions hereinafter discussed.

The case was tried before the court, and resulted in a judgment in favor of appellees, allowing appellant no recovery. The court filed findings of fact and conclusions of law.

Was the debt contracted on July 15, 1919, with the Security National Bank by L. H. Lewis and by J. H. Webb their individual debt, or was such indebtedness lawfully contracted ·by said parties for the use and benefit of the L. H. Lewis Company, and therefore its indebtedness? An answer to this· question will be determinative of the right of appellant to recover from such bank the $29,000 paid to it by the L. H. Lewis Company in the summer of 1921. Lewis' plan, in reference to this block of 500 shares of the capital stock of the Lewis Company, was twofold. He desired, first, to have the money representing the par· value of this stock in the treasury of his company before it opened for business, so that his company could begin business with its full capital stock of $500,000 paid in ; and, second, that the status of this block of stock would be such as that it could be subject to purchase by those whom he deemed desirable to have interested in the business of his company. He desired also to accomplish these two objects in a manner that would give to his company the full credit that would normally result from the fact that the par value of its entire capital stock had been paid in and there were no outstanding obligations. His first suggestion to Hobby was that it be carried as treasury stock and its par value advanced to his company by the Security National Bank on this stock. Manifestly this could not be done, for the reason that, if the money were advanced to his company on this treasury stock, it would be an outstanding obligation of the company for $50,000, and the credit of the company would be necessarily impaired to that extent. These 500 shares represented unissued stock that had been subscribed for by Lewis and Webb. If there should be an immediate redemption of their stock subscription by them, then both objects could be achieved, for Lewis and Webb, as officers of the company and its chief promoters, could hold this stock subject to purchase by such desirable persons when they should be induced to become interested in the L. H. Lewis Company. This was the plan suggested by Hobby and accepted by Lewis. The agreement was made that Lewis execute his note to the bank for $35,000, and Webb execute his note for $15,000, and with

the $50,000 thus secured, the 500 shares were issued—350 to Lewis and 150 to Webb. The stock certificates issued became the personal property of Lewis and Webb, and the indebtedness created became ¡their personal indebtedness. The undisputed evidence shows that each had recognized this to be the status of such indebtedness, for Lewis and Webb paid the interest accruing on this indebtedness from time to time out of their own funds, and Webb paid $1,000 out of his own funds on the principal of his note. The undisputed evidence shows that when, on the insistence of the Security National Bank, through Hobby, its cashier, this indebtedness was assumed by the L. H. Lewis Company, both Lewis and Hobby recognized that it was the debt of said individuals and not the debt of the Lewis Company, for the assumption of the debt was made on the understanding of both parties that, when the emergency passed away that caused the Security National Bank to demand such a procedure, the old status of the indebtedness would be restored.

[1] The conclusion being inescapable that the $35,000 note executed by L. H. Lewis to the Security National Bank represented his personal indebtedness, and that the $15,000 note executed by J. H. Webb represented his personal indebtedness, the conclusion is likewise inescapable that, when the Security National Bank, through its vice president and cashier, Edwin Hobby, with full knowledge of all the facts, demanded and secured from L. H. Lewis, president of the L. H. Lewis Company, the liquidation of this personal indebtedness by the execution of the notes of L. H. Lewis Company and their substitution for the notes of Lewis and Webb, the Security National Bank became a responsible participant to the wrong perpetrated on the L. H. Lewis Company, its shareholders and creditors. The use of the money of the Lewis Company to discharge three of the notes given for this illegal purpose was an unlawful diversion of the funds of the L. H. Lewis Company. Articles 1348 and 1349, R. C. S. 1925 ; Newton v. Houston Hot Well Improvement Co. (Tex. Civ. App.) 211 S. W. 960 ; McCaleb v. Boerne Electric Power & Mfg. Co. (Tex. Civ. App.) 173 S. W. 1191 ; North Side Ry. Co. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778 ; Taylor Feed & Pen Co. v. Taylor National Bank (Tex. Civ. App.) 177 S. W. 176 ; Deaton Grocery Co. v. Harvester Co. (Tex. Civ. App.) 105 S. W. 556.

When there was such unlawful diversion of $29,000 of the money of the L. H. Lewis Company, an action against those participating in such an unlawful act could have been maintained by such company at any time from such diversion up to the date of bankruptcy to recover this amount from either or ·both of the wrongdoers. There is no element of estoppel under the facts in this case. The Security National Bank, through its said cashier, was the prime mover and· instigator

of the wrong perpetrated on the corporation and its shareholders when such bank deliberately chose to require the L. H. Lewis Company, through the single act of its president, to assume this indebtedness and deliberately released the real debtors from their obligation. It took this course at its peril and with full knowledge that neither Lewis, as president, nor the board of directors, could so divert corporate funds.

[2-4] What right has appellant, as trustee in bankruptcy, in the premises? It is provided by section 110 (a), 11 USCA (section 70a of the Bankruptcy Act), that the trustee shall be vested by operation of law with the title of the bankrupt as of the date of the adjudication, except as to exempt property, and that he shall have all powers which the bankrupt might have exercised for his own benefit. In subdivision (e) of said section (11 USCA § 110 [e]) it is provided that—

"The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of the adjudication. Such property may be recovered or its value collected from whoever may have received it, except a bona fide holder for value."

By an amendment to the Bankrupt Act, enacted in 1910 and made a part of section 75, 11 USCA (section 47, Bankruptcy Act), it is further provided that—

"As to all property in the custody or coming into the custody of the bankruptcy court," a trustee in bankruptcy "shall be deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied."

Under these sections of the Bankrupt Act, it is clear that appellant, as trustee of the bankrupt estate, is not only vested with title to all the property owned by the estate, and all the powers in reference to said property that the bankrupt possessed before bankruptcy, but, in addition thereto, is vested with all the rights of an execution creditor. In other words, appellant can avoid any unlawful transfer of property that the bankrupt could have avoided at the time of the adjudication, and any such transfer that a creditor holding a legal or equitable lien could have avoided. This, too, without regard as to whether at the time the unlawful transfer was made his bankrupt was solvent or insolvent. Baldwin v. Kingston (D. C.) 247 F. 163, and authorities there cited; affirmed by Circuit Court of Appeals, 257 F. 554.

We therefore are of the opinion that the trial court erred in his conclusion of law in reference to appellant's suit against the Security National Bank for the sum of $29,000, and we are further of the opinion that judgment should be rendered against said bank for such sum.

[5] We do not believe that, under the facts of this case, any judgment should be entered against the Southwest National Bank. It was no party to the wrongful diversion of the $29,000. It is true, under its agreement with the Security National Bank, it took over the assets of such bank and assumed the liabilities. At the time this contract was entered into, there was nothing to put the Southwest National Bank on notice that the note executed by the L. H. Lewis Company to the Security National Bank was other than what it purported to be—evidence of a legal debt owing by the Lewis Company to the Security National Bank, and, therefore, an asset of such bank, and was accepted by the Southwest National Bank as such. In other words, such latter bank was a bona fide holder of this $20,000 note for value. The very section of the Bankrupt Act which gives appellant a cause of action against the Security National Bank decrees that such transfer of property shall not be avoided when it is held by a bona fide holder for value prior to the date of adjudication. We are therefore of the opinion that the trial court correctly rendered judgment in favor of the Southwest National Bank, and that this case should be affirmed as to such appellee.

It therefore follows that this case should be reversed and rendered in favor of appellant for the sum of $29,000 against appellee the Security National Bank, and should be affirmed as to appellee the Southwest National Bank.

Reversed and rendered in part, and affirmed in part.